DiCesare v. Charlotte-Mecklenburg Hosp. Auth., 2017 NCBC 32.

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| MECKLENBURG COUNTY | 16 CVS 16404 |

CHRISTOPHER DICESARE;
JAMES LITTLE; and JOHANNA
MACARTHUR, individually and on
behalf of all others similarly situated,

          Plaintiffs,

      v.

THE CHARLOTTE-
MECKLENBURG HOSPITAL
AUTHORITY, d/b/a CAROLINAS
HEALTHCARE SYSTEM,

          Defendant.

**ORDER AND OPINION ON
DEFENDANT'S MOTION TO DISMISS
AND MOTION FOR JUDGMENT ON
THE PLEADINGS**

1.    **THIS MATTER** is before the Court on Defendant's Motion to Dismiss for Lack of Standing (the "Motion to Dismiss") and Motion for Judgment on the Pleadings (collectively, the "Motions"). For the reasons set forth below, the Court **DENIES** the Motions.

> *Elliot Morgan Parsonage, PLLC, by R. Michael Elliot; Lieff Cabraser Heimann & Bernstein, LLP, by Brendan P. Glackin, Dean M. Harvey, and Abbye R. Klamann; and Pearson, Simon & Warshaw, LLP, by Bruce L. Simon, Daniel L. Warshaw, and Benjamin E. Shiftan, for Plaintiffs.*

> *Womble Carlyle Sandridge & Rice, LLP, by James P. Cooney III, Debbie W. Harden, Meredith J. McKee, Sarah Motley Stone, and Russ Ferguson, and Boies, Schiller & Flexner LLP, by Hampton Y. Dellinger, for Defendant.*

Robinson, Judge.

## I. INTRODUCTION

2. As pleaded, this proposed class action arises out of provisions in contracts between Defendant Charlotte-Mecklenburg Hospital Authority ("Defendant" or the "Hospital") and insurance companies that allegedly reduce competition in the Charlotte area, increase the price of health insurance and healthcare services, reduce the number of health insurance plans available, and prevent access by consumers to truthful information about the cost and quality of the Hospital's services as compared to other providers. Plaintiffs bring this proposed class action on behalf of all North Carolina residents who have paid premiums from January 1, 2013 to the present to four insurance companies that provide insurance coverage to 85% of the commercially-insured residents of the Charlotte area. These contractual provisions are also the subject of a presently ongoing action brought by the United States Department of Justice and the Attorney General of North Carolina in the United States District Court for the Western District of North Carolina, *United States v. Charlotte-Mecklenburg Hospital Authority*, Case No. 3:16-cv-00311-RJC-DCK (the "Federal Action").

3. Plaintiffs bring two claims against the Hospital: (1) contract, combination, or conspiracy in restraint of trade in violation of N.C. Gen. Stat. §§ 75-1 and 75-2; and (2) monopolization in violation of Article I, Section 34 of the North Carolina Constitution and N.C. Gen. Stat. §§ 75-1.1, 75-2, and 75-2.1. The Motion to Dismiss seeks dismissal of both claims on the ground that Plaintiffs lack standing. The

Motion for Judgment on the Pleadings seeks judgment on both claims on the ground that Plaintiffs have failed to state a violation of any provision of Chapter 75.

## II. PROCEDURAL HISTORY

4. The Court sets forth here only those portions of the procedural history relevant to its determination of the Motions.

5. Plaintiffs initiated this action by filing their Complaint on September 9, 2016. The case was designated as a mandatory complex business case by order of the Chief Justice of the Supreme Court of North Carolina dated October 5, 2016 and assigned to the undersigned by order of Chief Business Court Judge James L. Gale dated October 6, 2016.

6. On October 18, 2016, Plaintiffs filed their First Amended Complaint ("FAC").

7. On December 16, 2016, Defendant filed the Motion to Dismiss and three exhibits attached thereto, a brief in support of the Motion to Dismiss, its answer to the FAC ("Answer") and five exhibits attached thereto, the Motion for Judgment on the Pleadings, and a brief in support.

8. On January 12, 2017 and March 30, 2017, Defendant provided the Court with Suggestions of Subsequently Decided Authority pursuant to Rule 7.9 of the General Rules of Practice and Procedure for the North Carolina Business Court.

9. The Motions have been fully briefed, and the Court held a hearing on the Motions on March 22, 2017. The Motions are now ripe for resolution.

## III.  FACTUAL BACKGROUND

10.  The Court states the following facts, drawing all reasonable inferences in favor of Plaintiffs, only for purposes of ruling on the Motions.

11.  The Hospital is a North Carolina, non-profit corporation providing healthcare services with its principal place of business in Charlotte, North Carolina. (First Am. Compl. ¶¶ 1, 11 [hereinafter FAC].)

12.  Named Plaintiffs Christopher DiCesare ("DiCesare"), James Little ("Little"), and Johanna MacArthur ("MacArthur") are citizens and residents of the State of North Carolina.  (FAC ¶¶ 8–10.)

13.  From before 2013 to the present, DiCesare has been insured under a Preferred Provider Organization ("PPO") health insurance plan offered by Cigna Healthcare of North Carolina, Inc. ("Cigna").  (FAC ¶ 8.)  DiCesare pays premiums to Cigna and has received medical care from the Hospital.  (FAC ¶ 8.)

14.  Little is a retired federal employee and is insured under a PPO health insurance plan offered by Blue Cross and Blue Shield of North Carolina ("BCBS"). (FAC ¶ 9.)  Little pays premiums to BCBS and is seen regularly at the Hospital's facilities.  (FAC ¶ 9.)

15.  MacArthur and her children are insured under a BCBS PPO health insurance plan offered by MacArthur's employer.  (FAC ¶ 10.)  From 2014 to the present, MacArthur has paid premiums for her insurance.  (FAC ¶ 10.)  MacArthur has received medical care from the Hospital.  (FAC ¶ 10.)

## A. Relevant Market

16. Acute inpatient hospital services consist of a broad range of medical and surgical diagnostic and treatment services that include a patient's overnight stay in the hospital. (FAC ¶ 22.) Individual acute inpatient hospital services are not substitutes for each other; however, Plaintiffs allege that insurers typically contract for various acute inpatient hospital services simultaneously and thus all individual acute inpatient hospital services are properly grouped together as one product. (FAC ¶ 22.) There are no reasonable substitutes for, or alternatives to, acute inpatient hospital services. (FAC ¶ 23.) As a result, Plaintiffs allege that a hypothetical monopolist of acute inpatient hospital services could profitably impose a small but significant price increase for those services over a sustained period of time. (FAC ¶ 23.) Therefore, Plaintiffs contend that a relevant product market is the sale of general acute inpatient hospital services to insurers. (FAC ¶ 20.)

17. Plaintiffs allege that insurers contract to purchase acute inpatient hospital services from hospitals within the geographic area where their enrollees are likely to require medical care, which is reasonably nearby their enrollees' homes or workplaces. (FAC ¶ 25.) The FAC alleges that individuals who live and work in the Charlotte area strongly prefer to receive acute inpatient hospital services in the Charlotte area and thus have little or no willingness to enroll in an insurance plan that does not provide network access to hospitals in the Charlotte area. (FAC ¶ 25.) Plaintiffs allege that acute inpatient hospital services outside the Charlotte area are not a reasonable substitute for such services within the Charlotte area. (FAC ¶ 26.)

The FAC alleges that competition from providers of acute inpatient hospital services outside the Charlotte area would not prevent a hypothetical monopolist provider of such services in the Charlotte area from profitably imposing small but significant price increases over a sustained period of time. (FAC ¶ 26.) Accordingly, Plaintiffs allege that a relevant geographic market is the Charlotte Combined Statistical Area as defined by the United States Office of Management and Budget (the "Charlotte Area"). (FAC ¶ 24.) The Charlotte Area includes the following counties in North Carolina: Cabarrus, Cleveland, Gaston, Iredell, Lincoln, Mecklenburg, Rowan, Stanly, and Union. (FAC ¶ 24.) Additionally, the Charlotte Area includes Chester, Lancaster, and York counties in South Carolina. (FAC ¶ 24.)

18.     Therefore, Plaintiffs contend a relevant market in this action is the sale of acute inpatient hospital services to insurers in the Charlotte Area. (FAC ¶ 28.)

### B.     Market Power

19.     The Hospital is the second largest public hospital system in the United States and the dominant hospital system in the Charlotte Area. (FAC ¶ 1.) From 2011 to 2015, the Hospital increased its number of care locations by over 50%, from approximately 600 to over 900, mostly through acquisitions. (FAC ¶ 29.) The Hospital's share of the relevant market is approximately 50%. (FAC ¶ 29.) The Hospital conducts business primarily through Carolinas Medical Center, a large general acute-care hospital in Charlotte. (FAC ¶ 11.) The Hospital operates nine other general acute-care hospitals in the Charlotte Area. (FAC ¶ 11.)

20. The Hospital's largest competitor is Novant Health, Inc. ("Novant"). (FAC ¶ 29.) Novant owns five general acute-care hospitals in the Charlotte Area and has less than half of the Hospital's annual revenues. (FAC ¶ 29.) CaroMont Regional Medical Center ("CaroMont") is the third-largest hospital in the Charlotte Area and has less than 10% of the Hospital's annual revenues. (FAC ¶ 29.)

21. Plaintiffs allege that there are significant barriers to entry or expansion in the relevant market. (FAC ¶ 27.) To build facilities capable of competing with the Hospital requires large capital costs; acquisition of hospital-size building sites; employees with a broad range of skills, training, and certifications; and the ability to overcome regulatory and licensing hurdles. (FAC ¶ 27.) Moreover, it takes years of construction to build adequate physical facilities. (FAC ¶ 27.)

22. Plaintiffs allege that Defendant's market power results from its large size, the comprehensive range of services it offers, its high market share, barriers to entry and expansion, and an insurer's need to include access to Defendant's hospitals in at least some of its provider networks in insurance plans that cover individuals in the Charlotte Area. (FAC ¶¶ 27, 30.) The FAC alleges that, from an insurer's perspective, smaller providers such as Novant and CaroMont are not reasonable substitutes for access to Defendant's hospitals because of the ubiquity and scale of Defendant's facilities. (FAC ¶ 30.) Thus, Plaintiffs allege that an insurer selling health insurance plans in the Charlotte Area must have the Hospital as a participant in at least some of its provider networks in order to have a viable health insurance business in the Charlotte Area. (FAC ¶ 45.)

23.    Plaintiffs further allege that the Hospital's market power is evidenced by its ability to profitably charge prices to insurers above competitive levels. (FAC ¶ 30.) Plaintiffs allege that the Hospital's market power has enabled it to negotiate high reimbursement rates with insurance companies, and one major health insurer reports that the Hospital demands reimbursement rates that are up to 150% more than those demanded by other hospitals in the Charlotte Area for the same services. (FAC ¶ 31.) Further, after acquiring various facilities from 2011 to 2015, the Hospital increased the billing rates for the same services provided by the acquired facilities. (FAC ¶ 29.)

## C.    Anti-Steering Provisions

24.    Plaintiffs allege that the Hospital's market power enables it to impose restrictions in its contracts with insurers that prevent insurers from steering insureds towards the Hospital's competitors (the "Anti-Steering Provisions"). (FAC ¶ 30.) Steering is a method by which insurers offer insureds options to reduce healthcare expenses. (FAC ¶ 32.) Typically, steering occurs when an insurer offers its insureds a financial incentive to use a lower-cost provider or lower-cost provider network. (FAC ¶ 32.) Insurers want to steer insureds towards lower-cost providers and offer innovative steering insurance plans. (FAC ¶ 33.)

25.    Tiered networks and narrow networks are popular steering tools. (FAC ¶¶ 36–37.) In a tiered network, insurers place healthcare providers that offer better value—lower cost, higher quality—healthcare services in top tiers. (FAC ¶ 36.) Insureds who use providers in the top tiers pay lower out-of-pocket costs for medical

care. (FAC ¶ 36.) In a narrow network, the insured is offered less in-network providers from which to choose in exchange for lower premiums and lower out-of-pocket costs. (FAC ¶ 37.)

26. Healthcare providers want insurers to steer insureds towards them because of the increased patient volume steering generates. (FAC ¶ 38.) Insurers' ability to steer gives providers a strong incentive to maximize their efficiency, maintain low prices, and offer high quality and innovative services in order to induce insurers to steer insureds towards them. (FAC ¶ 38.) As a result, insureds, and employers who provide health insurance to their employees, significantly benefit from the lower healthcare expenses steering generates. (FAC ¶ 38.)

27. The steering of patients away from the Hospital is one of the largest threats to the Hospital's revenues. (FAC ¶ 34.) Plaintiffs allege that beginning in 2013, the Hospital began imposing Anti-Steering Provisions in its contracts with insurers in order to protect itself from steering that would induce price competition and potentially require the Hospital to lower its high prices. (FAC ¶ 35.) Four insurers provide coverage to more than 85% of the commercially-insured residents of the Charlotte Area: Cigna, BCBS, Aetna Health of the Carolinas, Inc. ("Aetna"), and United Healthcare of North Carolina, Inc. ("United") (collectively, the "Four Insurers"). (FAC ¶ 43.) In its contract with each of the Four Insurers, the Hospital maintains and enforces Anti-Steering Provisions. (FAC ¶ 44.)

28. When the Hospital negotiates with insurers, the Hospital typically negotiates the prices and terms of network participation for acute inpatient hospital

services and other healthcare services at the same time. (FAC ¶ 45.) Plaintiffs allege that, as a result, the Anti-Steering Provisions apply to acute inpatient hospital services and all other negotiated services. (FAC ¶ 45.) Plaintiffs allege that the Anti-Steering Provisions prevent insurers from offering tiered networks that feature the Hospital's competitors in the top tiers and narrow networks that only include the Hospital's competitors. (FAC ¶ 40.)

29.     Plaintiffs allege that insurers have tried to negotiate the removal of the Anti-Steering Provisions for years but have been unable to do so because of the Hospital's market power. (FAC ¶ 33.) The contractual language of the Anti-Steering Provisions varies with each insurer, but "it consistently creates disincentives that deter insurers from providing to their enrollees truthful information about their healthcare options and the benefits of price and quality competition among healthcare providers that the insurers could offer if they had full freedom to steer." (FAC ¶ 44.)

30.     Plaintiffs allege that, "[i]n the absence of the [Anti-Steering Provisions], insurers would likely steer consumers to lower-cost providers more than their current contracts with [the Hospital] permit." (FAC ¶ 33.) The Anti-Steering Provisions prevent the Hospital's competitors from attracting more patients through lower prices. (FAC ¶ 42.) Plaintiffs allege that, as a result, the Hospital's competitors have less incentive to remain lower priced and be more efficient. (FAC ¶ 42.) According to Plaintiffs, the Anti-Steering Provisions thereby

> lessen competition between [the Hospital] and the other providers of
> acute inpatient hospital services in the Charlotte [A]rea that would, in

the absence of the [Anti-Steering Provisions], likely reduce the prices paid for such services by insurers. . . . As a result of this reduced competition due to [the Anti-Steering Provisions], individuals and employers such as Plaintiffs in the Charlotte [A]rea pay higher prices for health insurance coverage, have fewer insurance plans from which to choose, and are denied access to consumer comparison shopping and other cost-saving innovative and more efficient health plans that would be possible if insurers could steer freely. Deprived of the option to benefit from choosing more cost-efficient providers, Charlotte [A]rea patients also incur higher out-of-pocket costs for their healthcare.

(FAC ¶¶ 46–47.) Plaintiffs allege that the Anti-Steering Provisions have had, and will continue to have, the following anticompetitive effects in the relevant market:

a. protecting [the Hospital]'s market power and enabling [the Hospital] to charge supracompetitive prices for acute inpatient hospital services;

b. substantially lessening competition among providers of acute inpatient hospital services;

c. restricting the introduction of innovative insurance products that are designed to achieve lower prices and improved quality for acute inpatient hospital services;

d. reducing consumers' incentives to seek acute inpatient hospital services from more cost-effective providers; and

e. depriving insurers and their enrollees of the benefits of a competitive market for their purchase of acute inpatient hospital services.

(FAC ¶¶ 52, 58.)

31. At the same time, Plaintiffs allege that the Hospital encourages insurers to steer insureds towards the Hospital by offering insurers "modest concessions on its market-power driven, premium prices." (FAC ¶ 39.) The Hospital has gained patient volume and higher revenues from insurers steering insureds towards the Hospital. (FAC ¶ 39.)

32. In addition to the Anti-Steering Provisions, Plaintiffs allege that the Hospital imposes restrictions that impede insurers from providing truthful information to insureds about the cost and quality of the Hospital's healthcare services as compared to the services of the Hospital's competitors. (FAC ¶ 41.) Plaintiffs allege that these restrictions are an indirect restriction on steering because they prevent insureds from accessing information that would allow them to make healthcare choices based on information regarding price and quality. (FAC ¶ 41.)

D. The Motions

33. The FAC asserts two claims: (1) contract, combination, or conspiracy in restraint of trade in violation of N.C. Gen. Stat. §§ 75-1 and 75-2 (the "Restraint of Trade Claim"), and (2) monopolization in violation of Article I, Section 34 of the North Carolina Constitution and N.C. Gen. Stat. §§ 75-1.1, 75-2, and 75-2.1 (the "Monopolization Claim"). (FAC 14–15.) Plaintiffs seek monetary relief and injunctive relief enjoining the Hospital from imposing or enforcing the Anti-Steering Provisions. (FAC 18.) The Motion to Dismiss is made pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the North Carolina Rules of Civil Procedure ("Rule(s)") and seeks dismissal of Plaintiffs' claims on the sole ground that Plaintiffs lack standing to bring the claims alleged. The Motion for Judgment on the Pleadings is made pursuant to Rule 12(c) and seeks judgment on both the Restraint of Trade Claim and the Monopolization Claim on the ground that Plaintiffs have failed to allege a violation of any provision of Chapter 75.

## IV.  LEGAL STANDARD

34.  "Standing is a necessary prerequisite to a court's proper exercise of subject matter jurisdiction." *Neuse River Found., Inc. v. Smithfield Foods, Inc.*, 155 N.C. App. 110, 113, 574 S.E.2d 48, 51 (2002).  Standing arguments may be presented under both Rule 12(b)(1) and Rule 12(b)(6). *Teague v. Bayer AG*, 195 N.C. App. 18, 22–23, 671 S.E.2d 550, 554 (2009); *Neuse River Found., Inc.*, 155 N.C. App. at 113–14, 574 S.E.2d at 51; *Sykes v. Health Network Sols., Inc.*, 2013 NCBC LEXIS 52, at *8 (N.C. Super. Ct. Dec. 5, 2013).  In ruling on a motion to dismiss for lack of standing pursuant to Rule 12(b)(1), the Court may consider matters outside the pleadings in determining whether subject matter jurisdiction exists. *Keith v. Wallerich*, 201 N.C. App. 550, 554, 687 S.E.2d 299, 302 (2009); *Tart v. Walker*, 38 N.C. App. 500, 502, 248 S.E.2d 736, 737 (1978).

35.  In ruling on a motion to dismiss for lack of standing pursuant to Rule 12(b)(6), the Court reviews the allegations of the FAC in the light most favorable to Plaintiffs.  The Court's inquiry is "whether, as a matter of law, the allegations of the [FAC], treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory." *Harris v. NCNB Nat'l Bank of N.C.*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987).  For purposes of considering a Rule 12(b)(6) motion to dismiss, the Court construes the FAC liberally and accepts all its allegations as true. *Laster v. Francis*, 199 N.C. App. 572, 577, 681 S.E.2d 858, 862 (2009).

36.  Dismissal of a claim pursuant to Rule 12(b)(6) is proper "(1) when the [FAC] on its face reveals that no law supports [the] claim; (2) when the [FAC] reveals on its

face the absence of fact sufficient to make a good claim; [or] (3) when some fact disclosed in the [FAC] necessarily defeats the . . . claim." *Oates v. JAG, Inc.*, 314 N.C. 276, 278, 333 S.E.2d 222, 224 (1985); *see also Jackson v. Bumgardner*, 318 N.C. 172, 175, 347 S.E.2d 743, 745 (1986). Otherwise, "a complaint should not be dismissed for insufficiency unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim." *Sutton v. Duke*, 277 N.C. 94, 103, 176 S.E.2d 161, 166 (1970) (emphasis omitted).

37. When defendant moves for judgment on the pleadings pursuant to Rule 12(c), the standard of review is essentially the same as that under Rule 12(b)(6). *See Bank of Am., N.A. v. Rice*, 780 S.E.2d 873, 882 (N.C. Ct. App. 2015) ("It is well settled that '[b]oth a motion for judgment on the pleadings and a motion to dismiss for failure to state a claim upon which relief can be granted should be granted when a complaint fails to allege facts sufficient to state a cause of action or pleads facts which deny the right to any relief.'" (alteration in original) (quoting *Robertson v. Boyd*, 88 N.C. App. 437, 440, 363 S.E.2d 672, 675 (1988))). "Judgment on the pleadings is not favored by the law . . . ." *Huss v. Huss*, 31 N.C. App. 463, 466, 230 S.E.2d 159, 162 (1976). The function of Rule 12(c) "is to dispose of baseless claims or defenses when the formal pleadings reveal their lack of merit." *Ragsdale v. Kennedy*, 286 N.C. 130, 137, 209 S.E.2d 494, 499 (1974). "[J]udgment on the pleadings is not appropriate merely because the claimant's case is weak and he is unlikely to prevail on the merits." *Huss*, 31 N.C. App. at 469, 230 S.E.2d at 163. "A motion for judgment on the pleadings is allowable only where the pleading of the opposite party is so fatally deficient in

substance as to present no material issue of fact . . . ." *George Shinn Sports, Inc. v. Bahakel Sports, Inc.*, 99 N.C. App. 481, 486, 393 S.E.2d 580, 583 (1990).

38. "A motion for judgment on the pleadings should not be granted unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law." *Carpenter v. Carpenter*, 189 N.C. App. 755, 761, 659 S.E.2d 762, 767 (2008). On a Rule 12(c) motion, "[t]he movant is held to a strict standard and must show that no material issue of facts exists and that he is clearly entitled to judgment." *Ragsdale*, 286 N.C. at 137, 209 S.E.2d at 499. "[T]he court cannot select some of the alleged facts as a basis for granting the motion on the pleadings if other allegations, together with the selected facts, establish material issues of fact." *J. F. Wilkerson Contracting Co. v. Rowland*, 29 N.C. App. 722, 725, 225 S.E.2d 840, 842 (1976). The Court must read the pleadings in the light most favorable to the nonmoving party, and

> [a]ll well pleaded factual allegations in the nonmoving party's pleadings are taken as true and all contravening assertions in the movant's pleadings are taken as false. All allegations in the nonmovant's pleadings, except conclusions of law, legally impossible facts, and matters not admissible in evidence at the trial, are deemed admitted by the movant for purposes of the motion.

*Ragsdale*, 286 N.C. at 137, 209 S.E.2d at 499 (citations omitted).

## V.     ANALYSIS

### A.     Motion to Dismiss

39. The Motion to Dismiss seeks dismissal of Plaintiffs' claims on the ground that Plaintiffs lack standing. The Motion to Dismiss is made pursuant to both Rule 12(b)(1) and Rule 12(b)(6).

40.     Standing generally refers to a party's right to have a court decide the merits of a dispute. *Neuse River Found., Inc.*, 155 N.C. App. at 114, 574 S.E.2d at 52. Plaintiffs have the burden of proving that standing exists. *Id.* at 113, 574 S.E.2d at 51. The elements of standing are

> (1) "injury in fact"—an invasion of a legally protected interest that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* at 114, 574 S.E.2d at 52 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). Standing for redress of Chapter 75 violations is governed by N.C. Gen. Stat. § 75-16. *Hyde v. Abbott Labs., Inc.*, 123 N.C. App. 572, 575, 473 S.E.2d 680, 682 (1996). Section 75-16 provides, in relevant part, "[i]f any person shall be injured . . . by reason of any act or thing done by any other person, firm or corporation in violation of the provisions of this Chapter, such person . . . so injured shall have a right of action on account of such injury done[.]" N.C. Gen. Stat. § 75-16. In North Carolina, indirect purchasers have standing under section 75-16 to bring an action for violations of Chapter 75. *Teague*, 195 N.C. App. at 24, 671 S.E.2d at 555; *Hyde*, 123 N.C. App. at 584, 473 S.E.2d at 688.

### 1.     Under controlling North Carolina law, the allegations of the FAC are sufficient, at the pleading stage, to demonstrate standing.

41.     As the pleadings are the only matters of record before the Court relevant to the Motion to Dismiss, the Motion to Dismiss is properly considered under Rule 12(b)(6)'s standard of review. *See Munger v. State*, 202 N.C. App. 404, 410, 689 S.E.2d 230, 235 (2010) ("[I]f the trial court confines its evaluation [of standing] to the

pleadings, the court must accept as true the plaintiff's allegations and construe them in the light most favorable to the plaintiff.").

42. The Court concludes that the allegations of the FAC are sufficient to demonstrate standing to withstand the Motion to Dismiss. Plaintiffs allege that they pay for and receive health insurance from Cigna and BCBS. The FAC alleges that the Hospital imposes Anti-Steering Provisions in its contracts with the Four Insurers, which includes Cigna and BCBS. Plaintiffs contend that the Anti-Steering Provisions reduce competition between the Hospital and other providers of acute inpatient hospital services in the Charlotte Area and, as a result, Plaintiffs pay more for health insurance, incur higher out-of-pocket costs, have fewer insurance plans to choose from, and are denied access to truthful information that would enable Plaintiffs to comparison-shop based on cost and quality. At the pleading stage, these allegations sufficiently allege an injury in fact—increased cost and less consumer choice—that is fairly traceable, under the allegations of the FAC, to the Hospital's imposition of the Anti-Steering Provisions. *See Teague*, 195 N.C. App. at 28, 671 S.E.2d at 558 ("If [p]laintiff can demonstrate that the increased [component] prices affected the price of the goods he purchased, then he will have established the type of injury to indirect purchasers that the General Assembly intended to remedy by allowing indirect purchaser suits.").

43. The Hospital argues that Plaintiffs do not have standing because Plaintiffs allege that the relevant product market is the sale of acute inpatient hospital services to insurers but do not allege that they have received acute inpatient hospital services.

The Court finds the Hospital's argument unconvincing at this stage. Although the Hospital is correct that Plaintiffs contend that the relevant product market is the sale of acute inpatient hospital services to insurers, Plaintiffs' alleged injury relates to consumer choice, access to information, and the cost of health insurance and healthcare services generally, not simply the cost of acute inpatient hospital services. As such, whether or not Plaintiffs received or paid for acute inpatient hospital services is immaterial to the injury Plaintiffs have alleged here. *See Sidibe v. Sutter Health*, 4 F. Supp. 3d 1160, 1165–67, 1173 n.7 (N.D. Cal. 2013) (involving similar allegations that challenge anti-steering provisions in contracts between a healthcare provider and insurers and stating, in the context of defendant's abandoned motion to dismiss for lack of standing, that "[c]ourts in this [c]ircuit have consistently found that indirect purchasers have standing to maintain antitrust claims where anti-competitive conduct in an upstream market resulted in higher prices for indirect purchasers in an 'inextricably linked' downstream market" (citation omitted)).

44. The Hospital further argues that Plaintiffs lack standing because they do not allege that insurers could have obtained lower prices in the absence of the Anti-Steering Provisions and insurers would have passed on any cost-savings from such prices to Plaintiffs. In a similar vein, the Hospital argues that the high insurance prices of which Plaintiffs complain are determined by the insurance companies, not the Hospital. The Hospital contends that, as a result, Plaintiffs cannot establish that the Anti-Steering Provisions caused their alleged injury, and that any such injury is merely speculative.

45.     Contrary to the Hospital's contention, the FAC does allege that insurers could have obtained lower prices in the absence of the Anti-Steering Provisions, which would have resulted in cost-savings realized by Plaintiffs. The FAC alleges that "[the Hospital]'s maintenance and enforcement of [the Anti-Steering Provisions] lessen competition between [the Hospital] and the other providers of acute inpatient hospital services in the Charlotte [A]rea that would, *in the absence of the [Anti-Steering Provisions], likely reduce the prices* paid for such services *by insurers*." (FAC ¶ 46 (emphasis added).)  Plaintiffs further allege that, due to the reduced competition between the Hospital and other providers, insureds "such as *Plaintiffs* in the Charlotte [A]rea *pay higher prices* for health insurance coverage, have fewer insurance plans from which to choose, and are denied access to consumer comparison shopping and *other cost-saving innovative and more efficient health plans that would be possible if insurers could steer freely*." (FAC ¶ 47 (emphasis added).)

46.     Further, while the Court understands the logic underlying the Hospital's causation argument, under binding North Carolina law, Plaintiffs are not required at the pleading stage to prove a causal chain between the Hospital's challenged conduct and Plaintiffs' alleged injury. *Teague*, 195 N.C. App. at 27–28, 671 S.E.2d at 557–58. In *Teague*, the Court of Appeals rejected a similar causation argument by defendants, stating that

> [i]n a Rule 12(b)(6) determination we must decide whether [p]laintiff, as an indirect purchaser . . . , has antitrust standing to recover damages under Chapter 75. What is at issue is [p]laintiff's right of access to the courts, not the merits of his allegations. *A trial court will be better suited to assess whether [p]laintiff will be able to prove causation based*

> *on the alleged antitrust violation at the class certification and summary judgment stages.*

*Id.* at 28, 671 S.E.2d at 557–58 (emphasis added). In response to defendants' argument that damages were speculative and, at best, a rigorous economic analysis would be necessary to determine whether the increased prices of which plaintiff complained were the result of defendants' conduct or some other factor, the Court of Appeals in *Teague* stated that "'[c]omplex antitrust cases . . . invariably involve complicated questions of causation and damages.' . . . [T]hat is not sufficient reason to dismiss for lack of standing." *Id.* at 29, 671 S.E.2d at 558 (first omission in original) (citation omitted) (quoting *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1478 (9th Cir. 1997)).

47. The Hospital cites the Business Court's decision in *Universal Cab Co. v. City of Charlotte* to support its contention that Plaintiffs lack standing because Plaintiffs' alleged injury, higher health insurance prices, is the result of the independent action of the insurance companies. 2015 NCBC LEXIS 23 (N.C. Super. Ct. Mar. 5, 2015). Plaintiffs in *Universal Cab Co.* filed suit after they were not awarded a new taxicab operating agreement. *Id.* at *18. It was undisputed that the award of such an agreement was conditioned on the approval of at least eight out of the eleven members of the city council, and only one member was before the court. *Id.* at *19–21. Plaintiffs did not allege facts to show that the city council's decision not to award a new agreement to plaintiffs was the result of anything other than the legal, independent action of the city council. *Id.* at *24. As a result, Judge Bledsoe concluded that plaintiffs' alleged injury "was caused by the independent, legal and

valid action of the [city council] and not by the improper actions of any [d]efendant." *Id.* at \*25.

48. Here, unlike the allegations in *Universal Cab Co.*, Plaintiffs expressly allege that the higher prices Plaintiffs pay for insurance and healthcare are the result of the Anti-Steering Provisions imposed by the Hospital that lessen competition among providers and thereby increase Plaintiffs' healthcare costs. While the insurance companies conceivably are a major factor in the amount insureds pay for health insurance, the FAC alleges that such amount is significantly influenced by the Hospital's Anti-Steering Provisions because those provisions increase the prices insurers must pay and that increase is passed on to insureds. The Court must take these allegations as true at this stage of the proceeding.

49. To the extent that Plaintiffs' standing, based on the FAC, could be challenged for failure to adequately plead an "antitrust injury," this court has previously addressed the issue of the need for alleging "antitrust injury" at the pleading stage. *See Sykes*, 2013 NCBC LEXIS 52, at \*8. As stated by Chief Judge Gale in that case,

> there is no North Carolina case that has expressly recognized the concept of "antitrust injury" in the context of a Chapter 75 claim, although the concept appears well developed in federal precedent and has received substantial traction in several state courts. . . .
> The court is not yet persuaded that standing under Section 75-1.1 is necessarily coextensive with standing under Section 75-1, Section 75-2 or Section 75-2.1. It does not now conclude that the Court of Appeals decisions in *Teague* and [*Hyde*] mandate this conclusion. Drawing upon decisions arising under Section 75-1.1, Plaintiffs attempt to reduce the standing issue to a simple proposition that, "[t]he only thing required to have standing is a violation of any of the provisions of Chapter 75 and a resulting injury." It may instead prove that the appellate courts will

take a different approach to standing matched to a different scope of the various provisions of Chapter 75. . . .

. . . .

In sum, the court concludes that it has subject matter jurisdiction to proceed toward a more developed record, that Plaintiffs have demonstrated standing adequate to withstand an initial Rule 12(b)(6) inquiry, [and] that the question of whether the claims fall within the scope of the various sections of Chapter 75 should await a better developed record . . . .

*Id.* at \*9–13 (citations omitted).

50. The Court concludes that, until the Supreme Court of North Carolina rules otherwise, *Teague* is controlling and, as in that case, "[a]t [the] Rule 12(b)(6) stage in this action, Plaintiff[s] ha[ve] alleged sufficient facts in [the FAC] to show a right of recovery." *Teague*, 195 N.C. App. at 28, 671 S.E.2d at 558; *see also Mangum v. Raleigh Bd. of Adjustment*, 362 N.C. 640, 644, 669 S.E.2d 279, 283 (2008) ("In our de novo review of a motion to dismiss for lack of standing, we view the allegations as true and the supporting record in the light most favorable to the non-moving party. We also note that North Carolina is a notice pleading jurisdiction, and as a general rule, there is no particular formulation that must be included in a complaint or filing in order to invoke jurisdiction . . . . To deny a party his day in court because of his imprecision with the pen would elevate form over substance and run contrary to notions of fundamental fairness." (citations omitted) (internal quotation marks omitted)); *Neuse River Found., Inc.*, 155 N.C. App. at 113, 574 S.E.2d at 51 ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presume that general allegations

embrace those specific facts that are necessary to support the claim.'" (quoting *Lujan*, 504 U.S. at 561)).

51.     Notwithstanding the foregoing analysis, the Court finds it necessary to address the Hospital's argument that the Court should apply the framework set forth in *Crouch v. Crompton Corp.*, 2004 NCBC LEXIS 6 (N.C. Super. Ct. Oct. 26, 2004) to help guide the Court's determination of Plaintiffs' standing as indirect purchasers. Conversely, Plaintiffs argue that the Court of Appeals abrogated *Crouch* in *Teague*.

52.     The Court agrees with Plaintiffs and reads *Teague* as unequivocally stating that the factors articulated and applied by Judge Tennille in *Crouch* do not apply in determining indirect purchaser standing under North Carolina's antitrust laws, and the Court is bound by, and adheres to, *Hyde* and *Teague* as applied and discussed above.

53.     The Court notes, however, that healthcare and the health insurance industry have great import to both society and the economy.  In light of the challenged conduct involved in this case and the significant impact this case could have beyond the parties to this litigation—as well as the enormous cost and expense that the parties will endure in conducting discovery in this case—the Court believes the Hospital's reliance on *Crouch* and the intricate issue of indirect purchaser standing warrants more deliberate review.

54.     In *Illinois Brick Co. v. Illinois*, the Supreme Court of the United States held that indirect purchasers did not have standing to sue under the federal antitrust laws.  431 U.S. 720, 728 (1977).  Thereafter, in *Associated General Contractors v.*

*California State Council of Carpenters* ("*AGC*"), the Supreme Court set forth five factors that courts should consider in determining whether a plaintiff has standing under the federal antitrust laws: (1) the nature of the injury and whether plaintiff is a consumer or competitor in the market in which trade was allegedly restrained; (2) the directness or indirectness of the alleged injury; (3) whether damages are highly speculative; (4) the risk of duplicative recovery or complex apportionment of damages; and (5) whether there are more direct victims. 459 U.S. 519, 545 (1983). Six years later, the Supreme Court expressly held that, notwithstanding the Court's prior decisions holding that indirect purchasers do not have standing under the federal antitrust laws, states are free to enact statutes that permit recovery by indirect purchasers for violations of state antitrust laws. *California v. ARC Am. Corp.*, 490 U.S. 93, 101–02 (1989).

55. Our courts first addressed indirect purchaser standing under North Carolina's antitrust laws in *Hyde*, discussed above. In *Hyde*, plaintiffs were indirect purchasers of infant formula. 123 N.C. App. at 573–74, 473 S.E.2d at 681–82. Plaintiffs alleged that defendants violated North Carolina's antitrust laws by conspiring to fix the wholesale price of infant formula. *Id.* at 573, 473 S.E.2d at 681. Plaintiffs alleged that defendants' conspiracy caused the wholesale prices paid by the parties who purchased directly from the manufacturer to rise above the price that the direct purchasers would have paid absent the conspiracy. *Id.* Plaintiffs contended that, as downstream (indirect) purchasers of infant formula, they paid more for infant formula than they would have paid but for defendants' conspiracy. *Id.* at 574, 473

S.E.2d at 682. Defendants moved to dismiss plaintiffs' complaint under Rule 12(b)(6) on the ground that plaintiffs lacked standing under N.C. Gen. Stat. § 75-16 because they were indirect purchasers. *Id.* The trial court granted defendants' motion and plaintiffs appealed. *Id.*

56. The Court of Appeals stated that the issue on appeal was whether section 75-16 allows an indirect purchaser to bring a lawsuit under North Carolina's antitrust laws. *Id.* at 576, 473 S.E.2d at 683. After conducting a comprehensive analysis of the language of the statute, its legislative history, and federal cases interpreting section 4 of the Clayton Act before *Illinois Brick Co.*, the Court of Appeals expressly held that "indirect purchasers have standing under [N.C. Gen. Stat.] § 75-16 to sue for Chapter 75 violations." *Id.* at 584, 473 S.E.2d at 688.

57. In *Crouch*, decided after *Hyde*, the Business Court was also presented with the issue of indirect purchaser standing. The court conducted a thorough analysis of federal antitrust standing, indirect purchaser standing in other state jurisdictions, the Court of Appeals' decision in *Hyde*, and developments subsequent to *Hyde*. *See Crouch*, 2004 NCBC LEXIS 6, at *61. The court did not dispute that it was bound by the Court of Appeals' decision in *Hyde* holding that indirect purchasers have standing under section 75-16. *Id.* at *3. The court explained, however, that the court in *Hyde* was not confronted with the issue of the scope of indirect purchaser standing, and that such standing was not limitless. *Id.* at *3, *59. The court emphasized that the Court of Appeals in *Hyde* expressly stated that the issue before it was whether section

75-16 permits an indirect purchaser to bring an action under Chapter 75, not the bounds of when section 75-16 so permits. *Id.* at \*37.

58.     Based on policy considerations, the *Hyde* decision, and developments subsequent to *Hyde*, the court in *Crouch* stated that it believed that North Carolina courts would apply a modified version of the *AGC* factors to determine the limits on standing in indirect purchaser cases. *Id.* at \*61. Those factors were: (1) whether plaintiff is a consumer or competitor in the allegedly restrained market; (2) the directness of the impact on plaintiff; (3) whether there are other indirect purchasers who are more directly impacted; (4) the speculative nature of the damages claim; and (5) the risk of duplicative recovery and the danger of complex apportionment of damages. *Id.* at \*61–64. The court expressly discussed how these factors would be applied with the understanding that indirect purchasers have the right to recover under section 75-16 for actual injury sustained. *Id.* The Business Court's decision in *Crouch* was not appealed.

59.     After the Business Court's decision in *Crouch*, the Court of Appeals was again faced with the issue of indirect purchaser standing under section 75-16 in *Teague*, also discussed above. In that case, plaintiff alleged that he purchased products that contained a specific terpolymer component ("EPDM") found in many consumer products. *Teague*, 195 N.C. App. at 20, 671 S.E.2d at 553. According to plaintiff, the amount of EPDM in a given product varied anywhere between 1% and 90%. *Id.* Plaintiff alleged that defendants, manufacturers of EPDM, engaged in price-fixing of EPDM, that middlemen passed on 100% of the overcharge to plaintiff,

and, as a result, plaintiff paid higher prices for products that contained EPDM. *Id.* at 20−21, 671 S.E.2d at 553. The trial court applied the *Crouch* factors and granted defendants' Rule 12(b)(6) motion to dismiss for lack of standing, and plaintiff appealed. *Id.* at 21, 25, 671 S.E.2d at 553, 556.

60. Relying on *Hyde*, the Court of Appeals reversed the trial court and held that plaintiff had standing to bring his antitrust action. *Id.* at 28, 671 S.E.2d at 558. The Court of Appeals rejected defendants' arguments that the *Crouch* factors are a logical and appropriate standard to apply in indirect purchaser cases to distinguish actual injuries from those that are too remote. *Id.* at 25−26, 671 S.E.2d at 556. The Court of Appeals expressly held that "the *AGC* factors do not apply in determining which indirect purchasers have standing to sue under the North Carolina antitrust statutes." *Id.* at 26, 671 S.E.2d at 557. In addressing *Crouch*, the Court stated

> [d]efendants cite [*Crouch*], a case in which the trial court expressed strong concerns about stretching antitrust law to cover damages in cases like these. . . . The trial court in *Crouch* was concerned in part about the lack of express statutory language granting indirect purchaser standing or any definitive ruling by our Supreme Court on indirect purchaser standing. However, our Court and the courts in our state are clearly bound by the prior opinion of our Court in *Hyde* dealing with indirect purchaser cases, unless and until it is overturned by our Supreme Court or by enactments of the General Assembly, which has not occurred in the more than twelve years since *Hyde* was decided by our Court.

*Id.* at 27, 671 S.E.2d at 557.

61. In the case presently before this Court, the Court's conclusion that the allegations of the FAC are sufficient to demonstrate standing to survive a Rule 12(b)(6) motion does not relieve Plaintiffs of their ultimate burden to establish, rather than allege, injury in fact and the causal chain that our standing law requires. In

order to do so, the parties will undoubtedly conduct burdensome, time-consuming, and expensive discovery. The Court acknowledges that antitrust cases—especially those involving indirect purchasers—will often involve complicated causation and damages issues. Although our Supreme Court has stated that it agrees with the Court of Appeals' interpretation, set forth in *Hyde*, of "any person" as that term is used in section 75-16, *Walker v. Fleetwood Homes of N.C., Inc.*, 362 N.C. 63, 68, 653 S.E.2d 393, 397 (2007), our Supreme Court has not spoken on the precise, complex issue before this Court—that is, the means by which our courts are to distinguish those indirect purchasers who have sustained actual injuries from those who have sustained injuries that are too remote or attenuated to warrant relief.

62. In light of the heavy burdens imposed by the inevitable, complicated issues indirect purchasers must confront in establishing standing, the significant costs and expenses incurred by all sides should this case proceed through discovery, the unavoidable recurrence of this issue in future cases, and the impact this case could have beyond the parties to this litigation, a ruling from the Supreme Court on this issue would be of great benefit to the parties, the business community, the consuming public, and the lower courts of this State. For these reasons, in the event Defendant seeks immediate appellate review of the Court's decision on this issue as set forth in this Order and Opinion, the Court urges the Supreme Court to docket the appeal. Further, if an appeal is allowed by the Supreme Court, this Court will exercise its discretion to stay all further proceedings in this matter in the trial court pending resolution of appellate proceedings.

63. In addition to arguing that Plaintiffs lack standing to assert their claims, the Hospital challenges the scope of Plaintiffs' claims, contending that Plaintiffs do not have standing to challenge the Anti-Steering Provisions in agreements between the Hospital and two of the Four Insurers, Aetna and United, because none of the Plaintiffs are insured by those entities.

64. The Hospital's argument is again unavailing. It is well settled that the named class representatives in a class action must have individual standing. *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974); *Dash v. FirstPlus Home Loan Tr. 1996-2*, 248 F. Supp. 2d 489, 504 (M.D.N.C. 2003). Plaintiffs assert two claims against the Hospital that arise out of the Hospital's imposition of Anti-Steering Provisions in its contracts with the Four Insurers, and Plaintiffs receive health insurance from two of the Four Insurers. The harm of which Plaintiffs complain is higher prices for insurance, higher prices for healthcare, restricted access to information, and less consumer choice, all allegedly as a result of the Anti-Steering Provisions. Although the FAC alleges that the language of the Anti-Steering Provisions varies with each insurance company, the FAC alleges that the language of such provisions in each contract "consistently creates disincentives that deter insurers from providing to their enrollees truthful information about their healthcare options and the benefits of price and quality competition among healthcare providers that the insurers could offer if they had full freedom to steer." (FAC ¶ 44.) Plaintiffs allege that the insureds of all Four Insurers pay higher prices and have less consumer choice due to the Hospital's imposition of the Anti-Steering Provisions.

65. Contrary to Defendant's contention, Plaintiffs are not attempting to use the class action device to bootstrap themselves into standing they lack, as the Court has already concluded that, based on the FAC and current procedural posture of the case, Plaintiffs have demonstrated standing to assert their claims as alleged against the Hospital, and "[s]tanding is that aspect of justiciability focusing on the *party* seeking a forum rather than on the *issue* he wants adjudicated." *Time Warner Entm't Advance/Newhouse P'ship v. Town of Landis*, 228 N.C. App. 510, 515, 747 S.E.2d 610, 614 (2013) (emphasis added). Moreover, the essence of the standing analysis is whether a plaintiff has alleged a personal stake in the outcome of the controversy. *Bailey & Assocs. v. Wilmington Bd. of Adjustment*, 202 N.C. App. 177, 184, 689 S.E.2d 576, 582 (2010). The Court finds that Plaintiffs have alleged such a personal stake here. *Dash*, 248 F. Supp. 2d at 504 ("[I]t is essential that named class representatives demonstrate standing through a requisite case or controversy between themselves personally and [defendants], not merely allege that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." (internal quotation marks omitted) (second alteration in original)).

66. The Court has already concluded, again based on the FAC and current procedural posture of the case, that Plaintiffs, as insureds of Cigna and BCBS, have demonstrated standing to assert their claims against the Hospital. Accordingly, the Court concludes that limiting the scope of Plaintiffs' claims at the pleading stage would be premature. The scope of Plaintiffs' claims—that is, whether Plaintiffs may challenge the Anti-Steering Provisions in the Hospital's contracts with Aetna and

United on behalf of insureds of Aetna and United—is more properly addressed at the class certification stage. The Court will be better equipped to determine the scope of Plaintiffs' claims on a more developed factual record. *See* 1 Newberg on Class Actions § 2.1 (5th ed. 2011) ("Whether a plaintiff with standing will be permitted to present not only her own individual claims but also those of a class is not properly a question of standing doctrine but of class action law.").

### 2. The Hospital's challenge to Plaintiffs' standing under Rule 12(b)(1), at this stage of the proceeding, fails.

67. To the extent the Motion to Dismiss for lack of standing is considered as one made pursuant to Rule 12(b)(1), the Court now addresses the matters in the record outside the FAC and the Hospital's arguments in reliance thereon. The record before the Court consists merely of the FAC, Answer and exhibits attached thereto, and the exhibits attached to the Motion to Dismiss. The Court's consideration of matters beyond the FAC does not affect the Court's conclusions.

68. First, the Hospital refers to the gross annual revenues of the Four Insurers, presumably taken from Exhibit 4 to the Answer. (Mem. Supp. Mot. Dismiss 2 n.1.) The Hospital, however, does not connect these revenues to Plaintiffs' standing.

69. Second, the Hospital refers to a solicitation of insureds in or around Charlotte that was posted on Plaintiffs' counsel's website. (Mot. Dismiss Ex. 1; Mem. Supp. Mot. Dismiss 5; Reply Supp. Mot. Dismiss 12 n.3.) The Hospital also refers to an article in the Charlotte Observer discussing the solicitation. (Mot. Dismiss Ex. 2; Mem. Supp. Mot. Dismiss 5.) Again, the Hospital does not explain how the solicitation bears in any way on Plaintiffs' standing.

70.     Third, the Hospital refers to the complaint filed in the Federal Action. (Mot. Dismiss Ex. 3.) The Hospital states that the FAC is largely duplicative of the federal complaint. (Mem. Supp. Mot. Dismiss 6 & n.3.) Again, however, the Hospital does not show why that duplication is relevant to the issue of Plaintiffs' standing.

71.     Fourth and last, the Hospital refers to its Answer and Exhibit 1 attached thereto to support its contention that the Hospital's annual revenues from its operations in the relevant market are less than half of what Plaintiffs claim. (Reply Supp. Mot. Dismiss 12.) The FAC alleges, however, that the Hospital has total annual revenues of approximately $9 billion. (FAC ¶ 29.) The FAC does not make any allegations with respect to the Hospital's revenues attributable to its operations in the relevant geographic market—in fact, Exhibit 1 to the Answer supports Plaintiffs' allegation, indicating the Hospital's total net revenue in 2014 was approximately $8.73 billion and approximately $9.04 billion in 2015. (Answer Ex. 1.) Moreover, assuming *arguendo* that the Hospital's revenues are relevant to Plaintiffs' standing, consideration of an exhibit to Defendant's Answer does not take the Court beyond the pleadings and, therefore, the Court must accept Plaintiffs' allegations on this issue as true. *Munger*, 202 N.C. App. at 410, 689 S.E.2d at 235 (stating that although a court may consider matters outside the pleadings in ruling on a motion to dismiss under Rule 12(b)(1) for lack of standing, if a court does not go beyond the pleadings, the court must accept plaintiff's allegations as true and construe them in the light most favorable to plaintiff); *see also Neuse River Found., Inc.*, 155 N.C. App. at 113, 574 S.E.2d at 51 ("[E]ach element [of standing] must be supported in the same

way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation."); *Universal Cab. Co.*, 2015 NCBC LEXIS 23, at *16 ("The Court will only grant a Rule 12(b)(1) motion if the material jurisdictional facts are not in dispute and the moving party is entitled to a judgment as a matter of law." (internal quotation marks omitted)).

72.    In sum, the Court concludes that, at this stage of the proceeding, the allegations of the FAC are sufficient to demonstrate standing to withstand a Rule 12(b)(6) motion to dismiss. Matters in the current record outside the FAC do not affect the Court's conclusion regarding Plaintiffs' standing to bring this action and, thus, consideration of those matters does not change the Court's analysis of the Motion to Dismiss under Rule 12(b)(1). The Court will have an opportunity to further consider Plaintiffs' standing as a more complete factual record is developed. *See Teague*, 195 N.C. App. at 28, 671 S.E.2d at 557–58; *Sykes*, 2013 NCBC LEXIS 52, at *13. Therefore, the Motion to Dismiss is denied.

### B.    Motion for Judgment on the Pleadings

73.    Defendant's Motion for Judgment on the Pleadings seeks judgment on the pleadings on both the Restraint of Trade Claim and the Monopolization Claim on the ground that Plaintiffs fail to state a violation of Chapter 75.

74.    As a preliminary matter, the Court addresses various references in Defendant's briefs to matters outside the pleadings and documents attached to Defendant's Answer. The law in North Carolina is clear that a court is not to consider

matters outside the pleadings in ruling on a motion under Rule 12(c). *Minor v. Minor*, 70 N.C. App. 76, 78, 318 S.E.2d 865, 867 (1984). Further, it is well settled that "[a] document attached to the moving party's pleading may not be considered in connection with a Rule 12(c) motion unless the non-moving party has made admissions regarding the document." *Reese v. Charlotte-Mecklenburg Bd. of Educ.*, 196 N.C. App. 539, 545, 676 S.E.2d 481, 486 (2009) (internal quotation marks omitted). Here, Plaintiffs have not made any admissions regarding the documents attached to Defendant's Answer and, therefore, the Court may not, and thus does not, consider them in ruling on Defendant's Motion for Judgment on the Pleadings.

1. **At the pleading stage, the allegations of the FAC are sufficient to state a restraint of trade claim.**

75. Plaintiffs contend that the Hospital's contracts containing the Anti-Steering Provisions unreasonably restrain trade in violation of N.C. Gen. Stat. §§ 75-1 and 75-2.

76. Section 75-1 prohibits contracts, combinations, and conspiracies that restrain trade or commerce, and section 75-2 prohibits restraints of trade that violate common law principles. N.C. Gen. Stat. §§ 75-1, -2. Section 75-1 is based on section one of the Sherman Act, and federal decisions applying the Sherman Act are instructive in determining the full reach of section 75-1. *Rose v. Vulcan Materials Co.*, 282 N.C. 643, 655, 194 S.E.2d 521, 530 (1973); *Sitelink Software, LLC v. Red Nova Labs, Inc.*, 2016 NCBC LEXIS 45, at *17 (N.C. Super. Ct. June 14, 2016) (citing *Rose*).

77.     The elements of a restraint of trade claim are: "(1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 202 (4th Cir. 2002).  Defendant does not dispute the first element.  As to the second element, sections 75-1 and 75-2 prohibit only those restraints of trade that are unreasonable.  *R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 380 (M.D.N.C. 2002).  To determine whether a restraint of trade is unreasonable, courts apply one of two rules.  *United States v. Am. Express Co.*, 838 F.3d 179, 193 (2d Cir. 2016).  Under the *per se* rule, certain practices, such as horizontal price-fixing, are presumed unreasonable and thus considered illegal *per se*.  *Id.* at 193–94.  A vertical restraint, as opposed to a horizontal restraint, is an agreement between persons at different levels of the market structure and is generally evaluated under the rule of reason.  *Id.* at 194.  Here, all parties agree that the restraints at issue are vertical restraints and thus are properly evaluated under the rule of reason.  The Court concludes, for purposes of deciding Defendant's Motion for Judgment on the Pleadings, that Plaintiffs' Restraint of Trade Claim should be analyzed under the rule of reason.  *See Window World of Baton Rouge, LLC v. Window World, Inc.*, 2016 NCBC LEXIS 82, at *12 (N.C. Super. Ct. Oct. 25, 2016) (applying the rule of reason analysis); *Sitelink Software, LLC*, 2016 NCBC LEXIS 45, at *18 (same).

78.     Under the rule of reason, Plaintiffs have the initial burden of showing that Defendant's challenged conduct has an adverse effect on competition as a whole in the relevant market.  *R.J. Reynolds Tobacco Co.*, 199 F. Supp. 2d at 380.  "Examples

of actual anticompetitive effects include reduced output, decreased quality, and supracompetitive pricing." *Am. Express Co.*, 838 F.3d at 194. Anticompetitive effects may be shown directly by establishing an actual adverse effect on competition. *Id.* Anticompetitive effects may also be shown indirectly "by showing that the defendant has 'sufficient market power to cause an adverse effect on competition.'" *Id.* (quoting *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 96 (2d Cir. 1998)). Market power alone, however, is insufficient to establish anticompetitive effects indirectly. *Id.* at 194−95. Plaintiffs must also show "some other ground for believing that the challenged behavior could harm competition in the market, such as the inherent anticompetitive nature of the defendant's behavior or the structure of the interbrand market." *Tops Mkts., Inc.*, 142 F.3d at 97. "[T]he structure of the interbrand market means, in practice, an inquiry into whether the challenged behavior significantly restrict[s] competitors' ability to enter the relevant market and compete—in other words, whether the challenged behavior create[s] significantly higher barriers to entry." *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 183−84 (2d Cir. 2016) (internal quotation marks omitted).

79.    If Plaintiffs satisfy their initial burden, the burden shifts to Defendant to provide evidence of the procompetitive effects of Defendant's challenged conduct. *Am. Express Co.*, 838 F.3d at 195. If Defendant satisfies that burden, the burden shifts back to Plaintiffs to prove that any legitimate competitive benefits could have been achieved by less restrictive means. *Id.*

80.     In antitrust cases, "dismissals at the pre-discovery, pleading stage remain relatively rare and are generally limited to certain types of glaring deficiencies[.]" *E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 444 (4th Cir. 2011) (internal quotation marks omitted); *Dickson*, 309 F.3d at 212; *Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 145 (4th Cir. 1990). Even under the more exacting federal pleading standard, "[a] complaint need not make a case against a defendant or forecast evidence sufficient to prove an element of the claim." *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 291 (4th Cir. 2012) (internal quotation marks omitted).

### a.     Relevant Market

81.     Before the Court can determine whether Plaintiffs have alleged sufficient facts to show that the Anti-Steering Provisions had anticompetitive effects on competition in the relevant market as a whole, Plaintiffs must define the relevant market. *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 513 (3d Cir. 1998) (stating that the burden is on plaintiff to define the relevant market); *Window World of Baton Rouge, LLC*, 2016 NCBC LEXIS 82, at *16 (same). A market has a product dimension and a geographic dimension. *E.I. du Pont de Nemours & Co.*, 637 F.3d at 441. "Product market definition turns on evidence of interchangeability of product use and manufacture, that is, on evidence of cross-elasticities of supply and demand." *Bepco, Inc. v. Allied-Signal, Inc.*, 106 F. Supp. 2d 814, 823 (M.D.N.C. 2000). "When there is cross-elasticity of demand between products in a market, 'the rise in the price of a good within [the] relevant market would tend to create a greater

demand for other like goods in that market."' *Brokerage Concepts, Inc.*, 140 F.3d at 514 (alteration in original) (quoting *Tunis Bros Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir. 1991)). The relevant geographic market is the "geographic area within which the defendant's customers who are affected by the challenged practice can practicably turn to alternative supplies if the defendant were to raise its prices or restrict its output." *E.I. du Pont de Nemours & Co.*, 637 F.3d at 441.

82. Here, Plaintiffs allege that a relevant market is the sale of general acute inpatient hospital services to insurers in the Charlotte Area, and Defendant does not contest that definition. Although Plaintiffs will ultimately bear the burden of defining the relevant market, the only issue before the Court in considering the Motion for Judgment on the Pleadings is whether Plaintiffs' allegations sufficiently state an anticompetitive effect on competition as a whole in the relevant market to survive dismissal under Rule 12(c).

### b. Anticompetitive Effect

83. "To have an anticompetitive effect, conduct must harm the competitive *process* and thereby harm consumers. Harm to one or many competitors will not suffice." *Dickson*, 309 F.3d at 206 (citation omitted) (internal quotation marks omitted) (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001)). "[A] plaintiff may succeed only when the loss he asserts derives from activities that have a 'competition-*reducing*' effect." *Tops Mkts., Inc.*, 142 F.3d at 96.

84. "Market power is the ability to raise prices above the levels that would be charged in a competitive market[,]" *R.J. Reynolds Tobacco Co.*, 199 F. Supp. 2d at

381, or "the power to force a purchaser to do something that he would not do in a competitive market[,]" *Dickson*, 309 F.3d at 207 n.17. Direct proof of market power requires evidence of restricted output and supracompetitive prices. *R.J. Reynolds Tobacco Co.*, 199 F. Supp. 2d at 381. Indirect proof of market power requires proof that Defendant owns a dominant share of the relevant market, and that significant barriers to entry exist and competitors lack the capacity to increase their output in the short run. *Id.* at 382–83.

85. Here, Plaintiffs allege that Defendant is the dominant hospital system in the Charlotte Area and has a market share of approximately 50%. Plaintiffs further allege that Novant, the Hospital's largest competitor, has less than half of the Hospital's annual revenues. Moreover, Plaintiffs allege that there are significant barriers to entry or expansion in the relevant market, such as overcoming regulatory and licensing hurdles and acquiring hospital-size building sites. Plaintiffs further allege that entry and expansion by other hospitals in the Charlotte Area have not counteracted the actual competitive harms resulting from the Anti-Steering Provisions, and that any future expansion is unlikely to be rapid enough to counteract such harms to competition. Contrary to Defendant's contention in its brief, Plaintiffs also allege that "insurers have tried to negotiate the removal of [the Anti-Steering Provisions] from their contracts with [the Hospital], but have been unable to do so as a result of [the Hospital]'s market power." (FAC ¶ 33.)

86. Therefore, the Court concludes that, at the pleading stage, the allegations of the FAC are sufficient to state that the Hospital has market power for purposes of

the Court's Chapter 75 analysis. *See Sitelink Software, LLC*, 2016 NCBC LEXIS 45, at *27 ("Courts are reluctant to dismiss claims on a Rule 12(b)(6) motion based on a failure to plead a relevant product market or sufficient market power, because defining a relevant market and a party's power within that market may ultimately require a fact-intensive inquiry.").

87. The FAC alleges that the Anti-Steering Provisions have the following anticompetitive effects in the relevant market: (1) protecting the Hospital's market power and enabling it to charge supracompetitive prices; (2) substantially lessening competition among providers of acute inpatient hospital services; (3) restricting the introduction of innovative insurance products designed to achieve lower prices for, and higher quality of, acute inpatient hospital services; (4) reducing consumers' incentives to obtain acute inpatient hospital services from more cost-effective providers; and (5) depriving insurers and insureds of the benefits of a competitive market for acute inpatient hospital services. Plaintiffs further allege that, due to the Anti-Steering Provisions, Plaintiffs have less insurance plans from which to choose and are denied access to information about the cost and quality of the Hospital's services compared to its competitors.

88. Regardless of whether the method of satisfying the adverse effect requirement is labeled direct or indirect, "there is really only one way to prove an adverse effect on competition under the rule of reason: by showing actual harm to consumers in the relevant market. How actual harm is shown determines whether proof of market power is also required." *MacDermid Printing Sols. LLC*, 833 F.3d at

182–83 (footnote omitted). Protecting market power through means other than competition on the merits, as Plaintiffs allege here, has been found to constitute an anticompetitive effect. *Microsoft Corp.*, 253 F.3d at 62. Moreover, Plaintiffs contend that the Anti-Steering Provisions enable the Hospital to charge, and that the Hospital does in fact charge, supracompetitive prices that are passed on to insureds. Supracompetitive pricing can satisfy the proof requirements of an actual adverse effect on competition. *Am. Express Co.*, 838 F.3d at 205–06 ("Plaintiffs might have met their initial burden [at trial] under the rule of reason by showing . . . that Amex's pricing was set above competitive levels within the credit-card industry (i.e., supracompetitive pricing).").

89. "The overarching standard is whether [D]efendant['s] actions diminish overall competition, and hence consumer welfare." *Id.* at 195. The FAC alleges that the Anti-Steering Provisions reduce competition among providers of acute inpatient hospital services and that consumers pay more for health insurance and healthcare services, and have less information and consumer choice, than they otherwise would in a competitive market. *See MacDermid Printing Sols. LLC*, 833 F.3d at 186 ("[R]educed consumer choice can constitute harm to competition."). The Court concludes that, at the pleading stage, Plaintiffs' factual allegations are sufficient to state that the Anti-Steering Provisions have an actual adverse effect on competition as a whole in the relevant market.

90. In its briefs, the Hospital conflates Plaintiffs' initial burden of proving an adverse effect on competition with the ultimate determination of whether those

anticompetitive effects outweigh any procompetitive benefits that may be offered by Defendant. At this stage of the proceeding, however, the Court is required to take the allegations of the FAC as true and all contravening assertions in the Answer as false. Thus, Plaintiffs' "allegations of adverse effects on competition must be accepted as true, and [D]efendant['s] pro-competitive justifications considered unproven." *Advanced Health-Care Servs., Inc.*, 910 F.2d at 145; *see also Robertson*, 679 F.3d at 292 ("At this early stage of the litigation, we are not in a position to weigh the alleged anticompetitive risks . . . against their procompetitive justifications. This rule of reason inquiry is best conducted with the benefit of discovery and we thus express no view on the merits of the litigation beyond recognizing the sufficiency of the complaints.").

91. For the foregoing reasons, the Motion for Judgment on the Pleadings as to the Restraint of Trade Claim is denied.

### 2. At the pleading stage, the allegations of the FAC are sufficient to state a monopolization claim.

92. Plaintiffs contend that the Hospital has monopolized, and continues to monopolize, the relevant market in violation of Article I, Section 34 of the North Carolina Constitution and N.C. Gen. Stat. §§ 75-1.1, 75-2, and 75-2.1.

93. Section 75-1.1(a) proscribes unfair methods of competition and unfair or deceptive acts or practices in or affecting commerce. N.C. Gen. Stat. § 75-1.1(a). Section 75-2.1 proscribes monopolization and attempts to monopolize any part of trade or commerce. N.C. Gen. Stat. § 75-2.1.

94. "[A] monopolization violation consists of two elements: (1) the possession of monopoly power in the relevant market, and (2) willful maintenance of that power." *E.I. du Pont de Nemours & Co.*, 637 F.3d at 450. Monopolization is a form of restraining trade. *Dickson*, 309 F.3d at 202. "The same kind of practices, therefore, may evidence violations of both." *Id.*

95. As discussed above, Plaintiffs have alleged, and the Hospital does not contest, that a relevant market in this action is the sale of general acute inpatient hospital services to insurers in the Charlotte Area. Further, the Hospital does not argue that the allegations of the FAC are insufficient with respect to the second element; rather, the Hospital's arguments only challenge the sufficiency of the allegations as to the first element. Accordingly, in deciding the Motion for Judgment on the Pleadings, the Court only addresses the sufficiency of the allegations regarding monopoly power.

96. "[M]onopoly power is a higher degree of power than market power." *R.J. Reynolds Tobacco Co.*, 199 F. Supp. 2d at 394. "Monopoly power is the power to control prices or exclude competition. A defendant possesses monopoly power in the relevant market if it is truly predominant in the market." *Kolon Indus. Inc. v. E.I. Dupont de Nemours & Co.*, 748 F.3d 160, 173–74 (4th Cir. 2014) (citations omitted) (internal quotation marks omitted). In determining whether monopoly power exists, courts look at defendant's market share, the durability of defendant's market power, and whether there are significant barriers to entry. *Id.* at 174; *Bepco, Inc.*, 106 F. Supp. 2d at 830. Market share, while highly relevant to monopoly power, is not

conclusive. *Kolon Indus. Inc.*, 748 F.3d at 174 ("[T]here is no fixed percentage market share that conclusively resolves whether monopoly power exists . . . ."); *Broadway Delivery Corp. v. United Parcel Serv., Inc.*, 651 F.2d 122, 128 (2d Cir. 1981) ("The trend of guidance from the Supreme Court and the practice of most courts endeavoring to follow that guidance has been to give only weight and not conclusiveness to market share evidence."); *see also Sitelink Software, LLC*, 2016 NCBC LEXIS 45, at \*29–31 (stating that courts often apply certain presumptions for measuring market power, but a determination of market power turns on a fact-specific inquiry and an antitrust plaintiff must "demonstrate some minimal set of well-grounded factual allegations to support an assertion of market power").

97.     The Court concludes that, taking the allegations of the FAC as true and construing them in the light most favorable to Plaintiffs, the allegations are sufficient to state that the Hospital possesses monopoly power for the same reasons the allegations are sufficient to state that the Hospital has market power. Although Plaintiffs will bear a heavy burden in proving the existence of monopoly power if discovery reveals that the Hospital's market share is in fact 50%, that burden of proof is not imposed at the pleading stage. *See Broadway Delivery Corp.*, 651 F.2d at 129 ("Sometimes, but not inevitably, it will be useful to suggest [to the jury] that a market share below 50% is rarely evidence of monopoly power, a share between 50% and 70% can occasionally show monopoly power, and a share above 70% is usually strong evidence of monopoly power."). Therefore, the factual allegations of the FAC

sufficiently plead a monopolization claim under section 75-2.1 to withstand the Motion for Judgment on the Pleadings.

98. The Hospital additionally argues that, to the extent Plaintiffs' Monopolization Claim is brought under section 75-1.1, the claim is barred by the learned profession exemption set forth in section 75-1.1(b).

99. The learned profession exemption excludes professional services rendered by a member of a learned profession from the definition of commerce. N.C. Gen. Stat. § 75-1.1(b). For the learned profession exemption to apply, the entity whose conduct is being challenged must be a member of a learned profession, and the challenged conduct must be a rendering of professional services. *Wheeless v. Maria Parham Med. Ctr., Inc.*, 237 N.C. App. 584, 589, 768 S.E.2d 119, 123 (2014). It is well settled that hospitals are members of a learned profession for purposes of the learned profession exemption. *Shelton v. Duke Univ. Health Sys., Inc.*, 179 N.C. App. 120, 126, 633 S.E.2d 113, 117 (2006); *Wheeless*, 237 N.C. App. at 590, 768 S.E.2d at 123–24 (citing *Shelton*); *Cameron v. New Hanover Mem'l Hosp., Inc.*, 58 N.C. App. 414, 446–47, 293 S.E.2d 901, 920–21 (1982). Thus, the issue before the Court is whether the pleadings establish that the Hospital's conduct is a rendering of professional services.

100. Our courts have held that "a matter affecting the professional services rendered by members of a learned profession" falls within the learned profession exemption. *Wheeless*, 237 N.C. App. at 590, 768 S.E.2d at 123 (quoting *Burgess v. Busby*, 142 N.C. App. 393, 407, 544 S.E.2d 4, 11–12 (2001)); *see also Cameron*, 58

N.C. App. at 446–47, 293 S.E.2d at 920–21 (concluding that conduct fell within the learned profession exemption as it was "a necessary assurance of good health care"). The Hospital argues, relying on *Cameron*, that negotiating contracts with payers of healthcare services is "a necessary assurance of good health care" and accordingly falls within the learned profession exemption. Conversely, Plaintiffs argue, relying on *Reid v. Ayers*, 138 N.C. App. 261, 531 S.E.2d 231 (2000), that negotiating contracts is an "entrepreneurial aspect[]" that is "geared more towards [the Hospital's] own interests" and thus does not fall within the learned profession exemption. 138 N.C. App. at 267, 531 S.E.2d at 236. The Hospital ultimately bears the burden of proving that its conduct falls within the learned profession exemption. N.C. Gen. Stat. § 75-1.1(d).

101. The Court cannot conclude, based solely on the pleadings, that the learned profession exemption bars Plaintiffs' Monopolization Claim as a matter of law. Thus, the Court denies the Motion for Judgment on the Pleadings on this ground, without prejudice to Defendant's right to raise this issue in later motion practice based on a more developed factual record. *See Sykes v. Health Network Sols., Inc.*, 2013 NCBC LEXIS 50, at *30 (N.C. Super. Ct. Nov. 25, 2013).

102. Therefore, the Motion for Judgment on the Pleadings as to the Monopolization Claim is denied.

## VI.   CONCLUSION

103.   In sum, the Court concludes that Plaintiffs have satisfied the minimal pleading standards necessary to survive dismissal at this early stage of the litigation. For the foregoing reasons, the Motions are **DENIED**.

**SO ORDERED**, this the 11th day of April, 2017.


/s/ Michael L. Robinson
_____
Michael L. Robinson
Special Superior Court Judge
   for Complex Business Cases